## FOX *v.* MITCHELL.

1. BILLS AND NOTES—CANCELLATION—BURDEN OF PROOF.

   If the cancellation of a negotiable instrument is made unintentionally, or under a mistake or without the authority of the holder, it is inoperative, and the burden of showing that cancellation was effected upon one of such bases is upon party alleging it (2 Comp. Laws 1929, § 9372).

2. SAME—PRESUMPTION OF INDORSEMENT.

   In case a signature is so placed upon a negotiable instrument that it is not clear in what capacity the person making it intended to sign, he is deemed to be an indorser (2 Comp. Laws 1929, § 9266).

3. SAME—INTENTION AS TO SIGNATURE—EVIDENCE.

   One who signs a negotiable instrument otherwise than as maker, drawer or acceptor is deemed to be an indorser unless he clearly indicates by appropriate words his intention to be bound in some other capacity (2 Comp. Laws 1929, § 9312).

4. SAME—BLANK INDORSEMENT—EFFECT.

   A blank indorsement which is the only indorsement on a negotiable instrument renders it payable to bearer (2 Comp. Laws 1929, §§ 9258, 9280, 9283).

5. SAME—BLANK INDORSEMENT—NOTATION OF PAYMENT—DELIVERY.

   Where decedent payee's signature appears on face of note and delivery to maker was effected or presumption of delivery because of maker's possession was not overcome, such signature would constitute an indorsement in blank and even if maker had thereafter written in a notation of payment in full the efficacy of the blank indorsement would not thereby be altered (2 Comp. Laws 1929, §§ 9258, 9280, 9283).

6. SAME—BLANK INDORSEMENT—DELIVERY.

   Delivery is essential to complete negotiation of a negotiable instrument indorsed in blank.

7. SAME—PRESUMPTION OF DELIVERY.

   A valid and intentional delivery of a negotiable instrument is presumed until the contrary is proved where it is no longer in the possession of one whose name appears thereon (2 Comp. Laws 1929, § 9265).

8. Mortgages—Discharge of Note—Intent to Retain Liability on Mortgage.

A mortgage containing a covenant to pay the indebtedness evidenced by the terms of a promissory note is discharged by the discharge of the note where no intention was manifested to retain any liability on the mortgage as the mortgage follows the note.

9. Same—Discharge—Cancellation of Note—Burden of Proof.

In suit by mortgagee's administrator with will annexed to foreclose a second mortgage securing defendant's note where it appears decedent, a resident of England, had been defendant's mother-in-law, friendly relations had been maintained after death of defendant's husband, that defendant had borrowed money on above security, and had made some payments thereon and then produced note bearing notation in defendant's handwriting that it was paid in full, which notation appeared over signature of deceased, that mortgagee apparently remade her will and cut off defendant and notified her attorney that his services in connection with collection of note were no longer needed, defendant was entitled, pursuant to prayer of cross bill, to have mortgage discharged where plaintiff failed to sustain his burden of proof that the note was not properly discharged (2 Comp. Laws 1929, §§ 9258, 9265, 9266, 9280, 9283, 9312, 9372).

Appeal from Wayne; Murphy (George B.), J. Submitted April 16, 1942. (Docket No. 29, Calendar No. 41,741.) Decided June 10, 1942.

Bill by Raymond A. Fox, administrator with the will annexed of the estate of Lydia Mitchell, deceased, against Emma Rose Mitchell for foreclosure of real estate mortgage. Cross bill by defendant against plaintiff for discharge of real estate mortgage. Decree for plaintiff. Defendant appeals. Reversed.

*Raymond A. Fox,* for plaintiff.

*Daniel W. Ross* and *Walter M. Nelson,* for defendant.

Butzel, J. Raymond A. Fox, administrator with the will annexed of the estate of Lydia Mitchell,

deceased, made the following allegations in a bill of complaint filed by him as plaintiff. Lydia Mitchell, a resident of Ossett, County of York, England, died on January 30, 1939, leaving a will which was duly probated in England and ancillary administration whereof was granted to plaintiff by the probate court for the county of Wayne. She left an estate in the county of Wayne, State of Michigan, consisting of a promissory note executed by defendant Emma Rose Mitchell and secured by a second mortgage upon a 20-family apartment house in the city of Detroit, upon which note there is a balance due of $6,860. In September, 1938, Emma, learning that Lydia, then 76 years of age, was seriously ill and under disabilities that prevented her from transacting business, went to England where she found Lydia on her death bed, too sick and feeble to manage her own affairs and with no hope of recovery, and by means of insistence, domination, deception and fraud, Emma secured access to Lydia's legal documents and papers and thus obtained possession of the promissory note. Emma has refused to make further payments on the note or to surrender it and she is still indebted for the balance of $6,860 due and unpaid on the note.

Lydia left surviving her as sole heir a daughter, Agnes Mitchell, who is of subnormal intellect, unable to support herself, and who was dependent upon her mother for support. Such note and mortgage constitute substantially the only asset of the estate. Without them there would be nothing left in the estate to take care of the daughter. Plaintiff seeks foreclosure of the mortgage. There are attached to the bill of complaint the last will of decedent, in which she bequeathes to Agnes all her "personal estate," and a copy of the note for $8,000, the original of which, plaintiff concedes, is not in his possession.

Defendant in her answer admits the allegations in regard to the language of the last will of decedent, the execution of the note secured by the second mortgage and the further fact that $1,140 has been paid on the note, thus leaving a balance of $6,860 were it not, as defendant claims, that the note was fully paid and so marked and surrendered, and the mortgage thereby equitably discharged. She denies any fraud or deception on her part in securing the note with the language denoting payment indorsed thereon. She further denies that decedent was seriously ill at the time of the transaction or had been bedridden for months prior thereto. She admits that the daughter of decedent was a person unable to support herself, but denies that the note and mortgage constitute the only asset of the estate or that without them the estate would be so impoverished that the support of the daughter would be endangered.

Defendant, as cross plaintiff, also makes the following allegations. Decedent, a resident of England, had two sons and a daughter. One son, Harry, emigrated from England to the United States and resided for a substantial period in the city of Pontiac, Michigan, where he became mayor. He married cross plaintiff in 1914. He died on October 10, 1936, leaving cross plaintiff as well as his mother and sister Agnes surviving him. He was engaged in the real estate and building and other business, was a man of means, and by his efforts created an estate for his mother, who continued to live in England, but, throughout defendant's married life, made 17 trips from England to visit the home of Harry Mitchell. Defendant had also visited decedent in England once every year, and the relations between them were most cordial and affectionate. Upon the death of Harry Mitchell, de-

fendant did borrow from said decedent on a note secured by a second mortgage a sum of money which had come to said decedent through the generosity of defendant's husband. After payments were made on the note, there was a balance left of $6,860. The friendly relations between Emma and Lydia continued after Harry's death, and in September, 1938, defendant went to England to visit Lydia, at which time the latter herself voluntarily broached the subject of the settlement of her entire estate. Approximately two years previous to such visit Lydia Mitchell had made a last will and testament leaving all of her estate to defendant, but, when defendant went to England in 1938, decedent on September 26, 1938, marked the promissory note paid and delivered it to defendant and stated that as soon as she could secure the real estate mortgage, which she did not have at her home and which she would send for, she would mail it to defendant; 18 days later she executed a last will revoking her former will and leaving the residue of her property to her daughter Agnes, which residue was ample to care for Agnes and consisted of a house and lot and a bank account of several thousand dollars. On September 24, 1938, decedent wrote to plaintiff (now the administrator), who had been her counsel for the collection of the note, stating that she no longer required his services as an attorney and thanking him for past favors. It was due solely to an oversight that decedent did not forward the mortgage with a discharge to cross plaintiff, who claims that the mortgage was equitably discharged. She asks that the court enter a decree discharging the mortgage.

Plaintiff, as cross defendant, in his answer to the cross bill reasserts his former charges and alleges that the only assets left in the estate with the ex-

ception of the note are of but little value and insufficient to support Agnes Mitchell. He admits that he received a letter, allegedly written by decedent, whom he then represented in the collection of the note, informing him that his services were no longer required, but he neither admits nor denies that decedent wrote the letter and leaves defendant to her proofs.

At the hearing of the case there was no evidence presented to substantiate plaintiff's charges of fraud, nor was there any showing that Harry Mitchell, defendant's husband, now deceased, gave the mortgaged property to decedent, nor is there any proof showing of what decedent's estate consists. In fact, the entire testimony is very meager. It was shown that the title to the apartment house was vested in decedent in 1936, while she was living in Detroit; that during the last illness of Harry Mitchell, decedent conveyed the property to a third person who immediately conveyed to Lydia, Harry and Emma Mitchell as joint tenants with sole right of survivorship and not as tenants in common. Harry Mitchell was a very sick man at the time and he died shortly thereafter in California, where he went in a futile effort to recover his health. Shortly thereafter, defendant, who had acquired possession of the deeds, recorded them. Decedent thereupon filed a bill in equity against defendant and the party to whom she had conveyed the title for the purpose of reconveyance to the three joint tenants. Decedent did not allege any fraud practiced on her in securing the deeds but she claimed that there was an oral agreement that they were not to be recorded during the lifetime of decedent. She did allege, however, that defendant had taken possession of the property and appropriated to herself all the rents therefrom. Very shortly thereafter, on

December 30, 1936, this suit was settled by an agreement whereby Lydia conveyed to Emma all her right, title and interest in the property. Emma paid her $2,000 in cash and gave her the note for $8,000 secured by the mortgage. The note was payable in monthly instalments of $60.

Mr. Frederick, an attorney who acted for Lydia in filing the bill to set aside the deeds, testified that Lydia's sole concern was a desire to have a source of income from the property during her lifetime, and it was at the suggestion of Emma that monthly payments of $60 instead of $50 were provided for in the note, and after the settlement had been reached the two women appeared to be very friendly. Afterwards they made a social call on him and stated that they were going to take a trip together to Florida. On February 15, 1937, after all of this difficulty, Lydia while in Detroit executed a new will leaving her entire estate to Emma. Lydia returned to England and toward the end of the year she wrote to Mr. Fox advising him that Emma had failed to forward the instalment for November, 1937, and asking him to look after her interest in the property and take what action he considered necessary; that as long as she received the monthly instalment she did not wish any other action taken. She wrote to him again in a somewhat similar vein on September 14, 1938. On September 16, 1938, she sent a letter evidently in her own handwriting to Mr. Fox stating that Emma thought she could not write but that she could; otherwise, how could she sign her bill for the bank? It is evident that it was about this date that Emma visited decedent at her home.

Plaintiff was unable to produce the note and explained its absence by the charges that defendant had fraudulently obtained it. Defendant thereupon

produced the note. At the bottom of the note and some considerable distance below Emma's signature appears the following handwritten legend:

"Blackpool England September 26–1938
    Paid in full
    LYDIA MITCHELL."

Mr. Fox refused to identify the signature of Lydia as genuine or state that it was not her signature. Mr. Frederick, however, positively identified the signature as that of Lydia Mitchell. We are satisfied from the record that it was her signature. The last will and testament of Lydia Mitchell dated October 14, 1938, and leaving the entire personal estate to Agnes Mitchell was drafted by Emma Mitchell. On October 14, 1938, Emma left England, and on January 30, 1939, Lydia died. The will was duly probated in England and plaintiff was thereafter appointed ancillary administrator with the will annexed by the probate court of the county of Wayne.

The case presented by plaintiff, after eliminating the charges of actual fraud set forth in the bill of complaint, of which there was no proof except possibly by innuendo, resolved itself into the foreclosure of a mortgage given to secure the note which plaintiff concedes was not in his possession and which defendant offered in evidence with the underwriting showing payment. When, however, Emma Mitchell undertook to tell the circumstances under which she received the note with decedent's signature under the legend "paid in full," she was confronted by objection by plaintiff that such testimony could not be given because it related to matters which, if true, must have been equally within the knowledge of the decedent.* The trial judge sus-

* See 3 Comp. Laws 1929, § 14219 (Stat. Ann. § 27.914).—RE-PORTER.

tained this objection, but permitted defendant's testimony to be taken on a separate record. On cross-examination of defendant, plaintiff brought out the fact that the words "Blackpool, England, Sept. 26, 1938, Paid in full," were in Emma's handwriting.

Plaintiff was confronted with a dilemma. He could not produce the note, neither could he explain its absence without opening the door to testimony that he asked to be excluded. However, even if the judge was correct in rejecting the testimony, plaintiff was confronted with a still more difficult situation in that the burden was upon *him* to show that the cancellation was made unintentionally, under a mistake or without authority of the holder. This burden he did not sustain. Both parties conceded that the note in question is a negotiable instrument. It appears on its face to have been discharged at Blackpool, England, September 26, 1938. Plaintiff contends that no competent witness has testified as to whether Lydia signed the note before or after the legend was written by Emma. This observation presents two alternative propositions, one of which must be true, and if either of them is true, plaintiff must fail as to his bill and defendant succeed as to her cross bill. If Lydia subscribed her name after the legend was written on the note, then section 123 of the uniform negotiable instruments law, Act No. 265, § 125, Pub. Acts 1905 (2 Comp. Laws 1929, § 9372 [Stat. Ann. § 19.165]), or bills of exchange act, 1882, 45 & 46 Vict., chap. 61, § 63(3), is applicable. It reads as follows:

"A cancellation made unintentionally, or under a mistake, or without the authority of the holder, is inoperative; but where an instrument or any signature thereon appears to have been cancelled the burden of proof lies on the party who alleges that

the cancellation was made unintentionally, or under a mistake or without authority.''

The burden of proof as fixed by the statute is on the one who contradicts the apparent cancellation by alleging it was made unintentionally, under a mistake or without authority. The burden thus was on the administrator to prove that the cancellation appearing on the instrument did not have the efficacy it appeared to have. *In re Philpott's Estate: LeClere* v. *Philpott* (Iowa), 164 N. W. 167; *Young* v. *Bank of Sweetwater*, 187 Ky. 71 (218 S. W. 463); *Jones' Admrs.* v. *Coleman*, 121 Va. 86 (92 S. E. 910); *Algeo* v. *Stewart*, 222 Mo. App. 1003 (7 S. W. [2d] 470). In *Drake Lumber Co.* v. *Semple*, 100 Fla. 1757 (130 South. 577, 75 A. L. R. 687), section 123 is cited but the proof was held sufficient to meet the burden by showing that the word ''paid'' had been stamped on the note unintentionally. We believe the foregoing cases establish the correct rule. Plaintiff relies on the case of *Bowen* v. *Worthington*, 191 N. C. 468 (132 S. E. 151), wherein the facts stated in the opinion are very meager and far different from the present case. While in that case the word ''paid'' was written on the note, the opinion does not show that the payee signed his name. If the case can be interpreted so as to support plaintiff's contentions, we believe it is not in accordance with the weight of authority. The case of *Grey* v. *Grey*, 47 N. Y. 552, also relied upon by plaintiff, was decided in 1872 before the earliest codification of the law of negotiable instruments. *Cherniss* v. *Thompson*, 209 Iowa, 309 (228 N. W. 66), shows that plaintiff therein sustained the burden of proof and does not overrule the former Iowa case, *In re Philpott's Estate, supra.*

If Lydia signed her name on the face of the note and later Emma without Lydia's knowledge or consent wrote above the signature the words purporting to discharge the mortgage, then sections 17 and 63 of the uniform negotiable instruments law, Act No. 265, §§ 19 and 65, Pub. Acts 1905 (2 Comp. Laws 1929, §§ 9266, 9312 [Stat. Ann. §§ 19.59, 19.105]), become applicable. They read as follows:

"Where the language of the instrument is ambiguous, or there are omissions therein, the following rules of construction apply:  *  *  *

"Sixth, Where a signature is so placed upon the instrument that it is not clear in what capacity the person making the same intended to sign, he is deemed to be an indorser." (2 Comp. Laws 1929, § 9266.)

"A person placing his signature upon an instrument, otherwise than as maker, drawer or acceptor is deemed to be an indorser, unless he clearly indicates by appropriate words his intention to be bound in some other capacity." (2 Comp. Laws 1929, § 9312.)

On this hypothesis, Lydia's signature was an indorsement in blank. Being the only indorsement on the instrument, it made it payable to bearer. The uniform negotiable instruments law, §§ 9, 31 and 34, Act No. 265, §§ 11, 33, 36, Pub. Acts 1905 (2 Comp. Laws 1929, §§ 9258, 9280, 9283 [Stat. Ann. §§ 19.51, 19.73, 19.76]). In such event the writing above the signature, if affixed after the delivery to Emma, would not alter the efficacy of the signature as a blank indorsement.

Plaintiff, however, argues that there was no competent evidence showing delivery of the note. Delivery would be essential to complete negotiation,

if Lydia merely indorsed the note in blank; and, if she intended to discharge the note, delivery, though not essential, would be highly evidentiary of such intent. The answer to this argument is given in section 16 of the uniform negotiable instruments law, Act No. 265, § 18, Pub. Acts 1905 (2 Comp. Laws 1929, § 9265 [Stat. Ann. § 19.58]), which reads as follows:

"Where the instrument is no longer in the possession of a party whose signature appears thereon, a valid and intentional delivery by him is presumed until the contrary is proved."

Although the mortgage contains a covenant to pay the indebtedness, evidenced by the terms of the promissory note, the discharge of the note where no intention was manifested to retain any liability on the mortgage would discharge the mortgage. The mortgage follows the note.

The circumstances of the case are peculiar. The close friendship of the parties, the making of the will by Lydia leaving everything to Emma after the giving of the note and the mortgage to Emma, Lydia's signature on the note with or without the legend appearing immediately above the signature, the making of the will by Lydia after the apparent discharge of the note and the indebtedness, the letter written by Lydia to her Detroit attorney telling him his services were no longer needed, all lead us to one conclusion that the obligation of the note was discharged. Even disregarding the testimony of the separate record, plaintiff failed to sustain the burden imposed upon him under the negotiable instruments law showing that the note was not properly discharged, and, therefore, defendant in possession of the note duly marked paid with de-

cedent's signature is entitled to have the mortgage discharged.

The decree of the trial court in favor of plaintiff is. reversed, with costs, and a decree will be entered in this court discharging the mortgage.

CHANDLER, C. J., and BOYLES, NORTH, STARR, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., took no part in this decision.